UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LISA MARIE HOLDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20 CV 1858 DDN |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the Court for judicial review of the final decision of defendant the Commissioner of Social Security denying the application of plaintiff Lisa Marie Holden for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.[2] The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

For the reasons set forth below, the decision of the Commissioner is affirmed.

## I.  BACKGROUND

Plaintiff Lisa Marie Holden, who was born on May 31, 1969, protectively filed her application on March 13, 2019.  (Tr. 15, 221-22.)  She alleged a disability onset date of November 29, 2018, due to chronic obstructive pulmonary disease (COPD), fibromyalgia,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Kilolo Kijakazi is substituted for Andrew Saul as defendant in this action. No further action is needed for this action to continue. *See* 42 U.S.C. § 405(g) (last sentence).

[2] Plaintiff's brief initially alleges that defendant denied her applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434 and supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* (Doc.14 at 1.)  A review of the record indicates that plaintiff applied only for disability insurance benefits.

diabetes, obesity, bipolar disorder, and depression.  (Tr. 237, 250.)  On May 31, 2019, plaintiff's application was initially denied.  (Tr. 117-21.)  On July 3, 2019, plaintiff appealed the decision and requested a hearing by an administrative law judge (ALJ).  (Tr. 124-25.)

On April 6, 2020, plaintiff attended a hearing before an ALJ.  (Tr. 41-63.)  On May 26, 2020, the ALJ denied plaintiff's application.  (Tr. 12-29.)  On October 29, 2020, the Appeals Council denied plaintiff's request for review.  (Tr. 1-6.)  The ALJ's decision therefore became the final decision of the Commissioner subject to judicial review by this Court under 42 U.S.C. § 405(g).

## II.  MEDICAL AND OTHER HISTORY

The following is a summary of plaintiff's medical and other history relevant to her appeal.

On February 10, 2017, plaintiff saw Paul Simon, D.O., at Advent Medical Group, for a psychiatric follow-up.  (Tr. 362.)  Her chief complaints were bipolar disorder and post-traumatic stress disorder.  (*Id.*)  Plaintiff displayed normal appearance, speech, thought process, mood, attention, and judgment.  (Tr. 363.)  Dr. Simon prescribed various medications and discussed treatment strategies with plaintiff.  (Tr. 364.)

On May 11, 2017, plaintiff saw Dr. Simon for a psychiatric follow-up.  (Tr. 358.)  Plaintiff displayed normal appearance, speech, thought process, mood, attention, and judgment.  (Tr. 359.)

On August 11 and November 8, 2017, plaintiff saw Dr. Simon for psychiatric follow-ups for bipolar disorder and grief.  (Tr. 351, 355.)  No major change in symptoms was reported.  (Tr. 351-57.)

On December 4, 2017, plaintiff saw Cheryl York, registered medical assistant, for cough.  (Tr. 495.)  Plaintiff reported she passed out because of coughing too hard.  (*Id.*)  She had shortness of breath and wheezing.  (*Id.*)  Ms. York injected Solu-Medrol.[3]  (*Id.*)

---

[3] Solu-Medrol is used to treat inflammation.  https://www.drugs.com/mtm/solu-medrol-in jection.html.

On December 18, 2017, plaintiff saw Joseph Polizzi, M.D., for a cardiology follow-up. (Tr. 492.)  Plaintiff reported that she had felt very well.  (*Id.*)  She reported no shortness of breath, dyspnea[4] on exertion, or wheezing.  (Tr. 492-93.)  The physical exam showed normal respiratory effort.  (Tr. 493.)

On December 27, 2017, plaintiff saw Susan Luedke, M.D., for a follow-up for her stage I breast cancer.  (Tr. 491.)  Plaintiff did not have shortness of breath.  (*Id.*)  The physical exam showed normal pulmonary effort and no respiratory distress, wheezes, or rales.  (*Id.*)

On February 6, 2018, plaintiff saw Adeel Khan, M.D., for a follow-up for COPD.  (Tr. 486.)  Plaintiff reported cough, shortness of breath, and wheezing.  (Tr. 490.)  The physical exam showed normal pulmonary effort and breath and no stridor, respiratory distress, wheezes, or rales.[5]  (*Id.*)

On February 12, 2018, plaintiff saw Dr. Simon for a psychiatric follow-up for bipolar disorder and grief.  (Tr. 347.)  Dr. Simon noted that plaintiff had failed or was currently failing at least one neuropsychiatric medication.  (Tr. 350.)  Dr. Simon contemplated an alteration in the neuropsychiatric medication treatment.  (*Id.*)

On February 14, 2018, plaintiff saw Amanda Burkheart, D.O., for upper respiratory tract infection.  (Tr. 483.)  Plaintiff had chest tightness, shortness of breath, and wheezing.  (Tr. 484.)  The physical exam showed wheezes, some diminished breath sounds, normal pulmonary effort, and no respiratory distress.  (*Id.*)

On March 16, 2018, plaintiff saw Dr. Simon for a psychiatric follow-up for bipolar disorder and grief.  (Tr. 343.)  Dr. Simon noted some worsening ongoing grief which appeared significant.  (Tr. 345.)

On March 21, 2018, plaintiff saw Anne Voss, nurse practitioner, for a six-month check and medication refill.  (Tr. 477-78.)  Plaintiff reported her COPD symptoms began several years ago and included mild cough and worsening wheezing with exertion.  (Tr. 477.)  She

---

[4] Dyspnea is shortness of breath.  https://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890.

[5] A rale is a small rattling, bubbling, or clicking sound in the lungs. https://medlineplus.gov/ency/article/007535.htm.

could walk 50 feet before resting.  (*Id.*)  Plaintiff was satisfied with current therapies, including Symbicort[6] and Albuterol[7] as needed.  (*Id.*)  The physical exam showed normal pulmonary effort and breathing.  (Tr. 478.)  Ms. Voss noted that plaintiff's COPD was well controlled by current therapies and did not change current therapies.  (*Id.*)

On April 3, 2018, plaintiff saw Misty Vogt, nurse practitioner, for a follow-up for hoarseness.  (Tr. 474.)  Plaintiff did not exhibit cough, shortness of breath, or wheezing.  (Tr. 475.)

On April 12, July 12, and October 5, 2018, and January 3, 2019, plaintiff saw Dr. Simon for psychiatric follow-ups for bipolar disorder, grief, and family issues. (Tr. 327, 331, 335, 339.)  No major change in symptoms was reported.  (Tr. 327-46.)

On April 23, 2018, plaintiff saw Dr. Burkheart for chronic medical conditions.  (Tr. 469.)  Plaintiff had mild COPD.  (Tr. 471.)  She felt her symptoms were not well controlled. (*Id.*)  Plaintiff had shortness of breath and wheezing.  (*Id.*)  The physical exam showed normal pulmonary effort, normal breathing, and no respiratory distress.  (Tr. 472.)

On April 27, 2018, plaintiff saw Julie Mai, M.D., for a routine follow-up.  (Tr. 466-67.) She had COPD, chronic dyspnea on exertion, and cough.  (Tr. 467.)  She had coughed so much that she felt dizzy.  (*Id.*)  Dr. Mai advised plaintiff to stop smoking.  (*Id.*)

On May 10, 2018, plaintiff saw Dr. Khan for a follow-up for COPD.  (Tr. 457-58.) Plaintiff reported cough, shortness of breath, and wheezing.  (Tr. 461.)  The physical exam showed normal pulmonary effort and breath and no stridor, respiratory distress, wheezes, or rales.  (Tr. 462.)

On June 14, 2018, plaintiff saw Nurse Voss for a sinus problem.  (Tr. 456.)  Plaintiff denied shortness of breath.  (*Id.*)

On June 18, 2018, plaintiff saw Dr. Polizzi for a cardiology follow-up.  (Tr. 453.) Plaintiff reported that she had felt very well.  (*Id.*)  She reported no shortness of breath, dyspnea

[6] Symbicort is used to treat symptoms caused by COPD, including wheezing and shortness of breath.  https://www.webmd.com/drugs/2/drug-148393/symbicort-inhalation/details.

[7] Albuterol is used to treat difficulty breathing, shortness of breath, wheezing, and chest tightness caused by COPD.  https://medlineplus.gov/druginfo/meds/a682145.html.

on exertion, or wheezing.  (Tr. 453-54.)  The physical exam showed normal respiratory effort.  (Tr. 454.)

On July 25, 2018, plaintiff saw Dr. Burkheart for chronic medical conditions.  (Tr. 448.)  Plaintiff had mild COPD.  (Tr. 450.)  She felt her symptoms were not well controlled but improving.  (*Id.*)  Plaintiff had shortness of breath and wheezing.  (*Id.*)  The physical exam showed normal pulmonary effort, normal breath, and no respiratory distress.  (Tr. 451.)  Plaintiff noted that breathing was still an issue and she needed Albuterol daily.  (Tr. 452.)  Her breathing had improved since she quit smoking.  (*Id.*)

On August 14, 2018, plaintiff saw Nurse Voss for generalized body aches, left toe pain, and rash.  (Tr. 446.)  Plaintiff did not exhibit cough or shortness of breath.  (*Id.*)  The physical exam showed normal pulmonary effort and breath.  (Tr. 447.)

On August 28, 2018, plaintiff saw Dr. Khan for management of COPD and obstructive sleep apnea.  (Tr. 437.)  Plaintiff took Spiriva[8] daily and Albuterol as needed.  (*Id.*)  She used her rescue inhaler at least once a day.  (*Id.*)  Plaintiff had cough and shortness of breath.  (Tr. 440.)   The physical exam showed normal pulmonary effort and breath and no stridor, respiratory distress, wheezes, or rales.   (Tr. 441.)

On August 31, 2018, plaintiff saw Dr. Burkheart for chronic pain and fibromyalgia.  (Tr. 434.)  Plaintiff did not exhibit cough, shortness of breath, or wheezing.  (Tr. 435.)  The physical exam showed normal pulmonary effort, normal breath, and no respiratory distress.  (*Id.*)

On October 2, 2018, plaintiff saw Dr. Khan for management of COPD and obstructive sleep apnea.  (Tr. 425.)  Plaintiff took Spiriva daily and Albuterol as needed.  (*Id.*)  She used her rescue inhaler at least once a day.  (*Id.*) The physical exam showed normal pulmonary effort and breath and no stridor, respiratory distress, wheezes, or rales.   (Tr. 429.)

On October 24, 2018, plaintiff saw Dr. Burkheart for a routine follow-up for her chronic medical conditions.  (Tr. 421.)  Plaintiff had mild COPD and felt her symptoms were better controlled.  (*Id.*)  Plaintiff complained of chronic widespread pain on bilateral shoulders, legs, hips, and feet.  (Tr. 422.)  Plaintiff had shortness of breath and wheezing, but no cough.  (*Id.*)

---

[8] Spiriva is used to prevent narrowing of the airways in the lungs in people with COPD.  https://www.drugs.com/spiriva.html.

The physical exam showed normal pulmonary effort, normal breath, and no respiratory distress.  (*Id.*)  Plaintiff's breathing was better controlled since she quit smoking.  (Tr. 423.) She did not need Albuterol quite as often.  (*Id.*)

On October 30 and December 3, 2018, plaintiff saw Dr. Khan for management of COPD and obstructive sleep apnea.  (Tr. 409, 415.)  Plaintiff took Spiriva daily and Albuterol as needed.  (*Id.*)  She used her rescue inhaler at least once a day.  (*Id.*)  The physical exam showed normal pulmonary effort and breath and no stridor, respiratory distress, wheezes, or rales.  (Tr. 414, 420.)  Dr. Khan continued Spiriva and Albuterol as needed.  (*Id.*)

On December 17, 2018, plaintiff saw Dr. Polizzi for a follow-up.  (Tr. 406.)  Plaintiff had some intermittent chest tightness, but she had otherwise felt well.  (*Id.*)  Plaintiff did not report shortness of breath at the appointment.  (*Id.*)  Plaintiff did not exhibit cough, dyspnea on exertion, or wheezing.  (Tr. 407.)  The physical exam showed normal respiratory effort. (*Id.*)

On December 26, 2018, plaintiff saw Nurse Voss for upper respiratory symptoms, cough, and sinus infection.  (Tr. 405.)  Plaintiff reported shortness of breath and getting slight relief from using her inhalers.  (*Id.*)  Ms. Voss noted bilateral wheezing and diagnosed plaintiff with acute bronchitis.  (*Id.*)

On January 2, 2019, plaintiff saw Dr. Leudke for a follow-up for her right breast cancer treated in 2015.  (Tr. 403.)  Plaintiff stopped smoking in June 2018.  (*Id.*)  She still had symptoms of COPD with some shortness of breath, but she felt a little bit better overall.  (*Id.*) Plaintiff denied shortness of breath at the appointment.  (*Id.*)  The physical exam showed normal pulmonary effort without respiratory distress.  (Tr. 404.)  Plaintiff had wheezes, but no rales.  (*Id.*)

On January 16, 2019, plaintiff saw Dr. Burkheart for a routine follow-up for chronic medical conditions.  (Tr. 398.)  Dr. Burkheart noted that plaintiff's COPD was mild.  (Tr. 399.) On average, plaintiff took Albuterol on a daily basis.  (*Id.*)  She did not use home oxygen.  (*Id.*) Plaintiff complained of chronic widespread pain on bilateral shoulders, legs, hips, and feet. (Tr. 400.) Plaintiff had shortness of breath and wheezing.  (*Id.*)

On March 1, 2019, plaintiff saw Jerry Marks, Ph.D., licensed clinical social worker, for a follow-up for grief.  (Tr. 370-71.)  Dr. Marks gave plaintiff coping strategies.  (Tr. 371.)

Plaintiff started having ongoing treatments with Dr. Marks since October 13, 2017.  (Tr. 381.)  On March 28, 2019, plaintiff saw Dr. Marks for a routine follow-up for grief.  (Tr. 372.)

On April 17, 2019, plaintiff saw Dr. Burkheart for a follow-up for chronic medical conditions.  (Tr. 582.)  Plaintiff did not feel that the symptoms of her mild COPD were well controlled.  (Tr. 584.)  She had shortness of breath and wheezing.  (Tr. 585.)  The physical exam showed normal pulmonary effort, normal breath, and no respiratory distress.  (*Id.*)

On May 22, 2019, plaintiff saw Dr. Burkheart for stitch removal, upper respiratory tract infection, and rash.  (Tr. 823.)  She reported shortness of breath and wheezing.  (Tr. 824.)  The physical exam showed normal pulmonary effort and breath, no respiratory distress, and no wheezes.  (*Id.*)

On June 3, 2019, plaintiff saw Dr. Khan for a follow-up for COPD and obstructive sleep apnea.  (Tr. 755.)  She reported shortness of breath, but no wheezing.  (Tr. 763.)  The physical exam showed normal pulmonary effort and breath and no stridor, respiratory distress, wheezes, or rales.  (Tr. 764.)

On June 17, 2019, plaintiff saw Dr. Polizzi for a follow-up.  (Tr. 688.)  She noted increased dyspnea with exertion and worsened neuropathy.  (*Id.*)  The physical exam showed normal respiratory effort.  (Tr. 691.)

On July 15, 2019, plaintiff saw Kyle Ostrom, M.D., for heart burn, diabetes, hypertension, and peripheral neuropathy.[9]  (Tr. 735.)  She had no dyspnea.  (Tr. 733.)  The physical exam showed normal respiratory effort.  (Tr. 734.)

On July 24, 2019, plaintiff saw Kristin Fisher, ANP, for a follow-up for her recent left heart catheterization.  (Tr. 694.)  She denied any worsening shortness of breath, orthopnea,[10] or paroxysmal nocturnal dyspnea.[11]  (*Id.*)  Plaintiff did not exhibit wheezing, but she had mild

---

[9] Peripheral neuropathy often causes numbness, pain, and weakness, usually in the feet and hands. https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061.

[10] Orthopnea is shortness of breath or difficulty breathing when someone is lying down. https://www.healthline.com/health/orthopnea.

[11] Paroxysmal nocturnal dyspnea causes sudden shortness of breath when someone is sleeping.  https://www.healthline.com/health/paroxysmal-nocturnal-dyspnea.

dyspnea on exertion.  (Tr. 695.)  The physical exam showed no wheezes, rales, or rhonchi. (Tr. 696.)

On August 16, 2019, plaintiff saw Dr. Ostrom for diabetes, bipolar disorder, and fibromyalgia.  (Tr. 738.)  The physical exam showed normal pulmonary effort and breath.  (*Id.*)

On September 3, 2019, plaintiff saw Dr. Khan for a follow-up for COPD and obstructive sleep apnea.  (Tr. 777.)  She reported shortness of breath, but no wheezing.  (Tr. 785.)   The physical exam showed normal pulmonary effort and breath and no stridor, respiratory distress, wheezes, or rales.  (*Id.*)

Between March 1 and December 18, 2019, plaintiff saw Dr. Marks and Dr. Simon for bipolar disorder and grief.  (Tr. 609-59.)

On October 1, 2019, plaintiff saw Dr. Khan for a follow-up for COPD and obstructive sleep apnea.  (Tr. 798.)  She reported shortness of breath, but no wheezing.  (Tr. 806.)  The physical exam showed normal pulmonary effort and breath and no stridor, respiratory distress, wheezes, or rales.  (*Id.*)

On October 1, 2019, plaintiff saw Nurse Practitioner Vogt for a follow-up for Reinke's edema[12] of the vocal cords and laryngopharyngeal reflux.[13]  (Tr. 660.)  Patient did not exhibit shortness of breath or wheezing.  (Tr. 662.)

On December 18, 2019, plaintiff saw Dr. Polizzi for a follow-up.  (Tr. 700.)  She reported no shortness of breath, orthopnea, paroxysmal nocturnal dyspnea, or dyspnea on exertion.  (Tr. 700, 702.)

On January 2, 2020, plaintiff saw Ms. Luedke for a follow-up for breast cancer.  (Tr. 604.)  Plaintiff had shortness of breath.  (*Id.*)  The physical exam showed normal pulmonary effort and no rhonchi or rales.  (Tr. 605.)

---

[12]  Reinke's edema is swelling of the non-muscle part of the vocal cord. http://www.otolaryngology.pitt.edu/centers-excellence/voice-center/conditions-we-treat/r einkes-edema.

[13]  Laryngopharyngeal reflux is a condition in which the stomach acid travels up the esophagus and gets to the throat.   https://my.clevelandclinic.org/health/diseases/15024-laryngopharyngeal-reflux-lpr.

On January 3, 2020, plaintiff saw Dr. Khan for a follow-up for COPD and obstructive sleep apnea.  (Tr. 809.)  She reported shortness of breath, but no wheezing.  (Tr. 817.)  The physical exam showed normal pulmonary effort and breath and no stridor, respiratory distress, wheezes, or rales.  (Tr. 818.)

**ALJ Hearing**

On April 6, 2020, plaintiff testified at a hearing before an ALJ.  (Tr. 41-63.)  She lives with her husband.  (Tr. 46.)  Plaintiff's husband works full-time outside the home, is not disabled, and does not require physical care from plaintiff.  (*Id.*)  Plaintiff can do basic things to care for herself on a daily basis, such as feeding herself, going to the toilet, and showering.  (*Id.*)  She is only responsible for caring for herself and her husband.  (*Id.*)  She has not had other types of social security or disability benefits in the past.  (*Id.*)  She has health insurance.  (Tr. 46-47.)  She finished twelfth grade.  (Tr. 47.)  She has not been working since June 2014.  (*Id.*)  She was a heavy equipment operator.  (*Id.*)  At her previous job, she ran a compactor, a scraper, a Hi-Lift, and a dozer.  (*Id.*)  She had to carry oil, ranging in weight from one to five gallons, and antifreeze to her tractors.  (Tr. 47-48.)  She has not had any supervisory lead position.  (Tr. 48.)  She used a compactor to compact dirt.  (*Id.*)  For equipment maintenance, she had to clean and oil the machinery but did not need to repair it.  (*Id.*)

Plaintiff is currently taking medications for diabetes.  (Tr. 48-49.)  Around June 2019, she started to develop worsening neuropathy in her calves and feet.  (Tr. 49.)  The neuropathy goes all the way down to her feet and into her toes.  (*Id.*)  The pain feels like needles shooting through her legs and feet or a knife stabbing her.  (*Id.*)  Walking is painful for her.  (*Id.*)  She has to stop and take a break after walking for 10 or 15 minutes.  (*Id.*)  She can stand in one place for 15 or 20 minutes.  (Tr. 49-50.)  She has difficulty sitting because of the neuropathy in her legs and feet.  (Tr. 50.)  She has to change position after sitting for 30 minutes.  (*Id.*)  She still has swelling in her legs every day.  (*Id.*)  She tries propping her feet up for 20 or 25 minutes a day to reduce the swelling, but it does not make a difference.  (Tr. 50-51.)

Plaintiff struggles with depression every day.  (Tr. 51.)  She feels down, wants to cry, and does not feel like doing anything.  (*Id.*)  The depression overwhelms her.  (*Id.*)  Her feelings come and go.  (*Id.*)  In terms of depression, she has five bad days in a week.  (Tr. 50-51.)  She

- 9 -

does not function well on her bad days.  (Tr. 52.)  The last time she gardened was two years ago; she cannot garden anymore.  (*Id.*)  She struggles with concentrating.  (*Id.*)  She cannot focus on reading a book or watching a TV show because she gets distracted easily.  (*Id.*)  She has severe anxiety from once every two weeks to once a week.  (*Id.*)  The anxiety that she struggles with is like an anxiety attack that typically lasts for 30 minutes.  (Tr. 53.)  She feels drained after the anxiety attacks, so she tries to relax as much as she can.  (*Id.*)  She has been having anxiety attacks for about four years.  (Tr. 57.)  Her anxiety attacks are not changing.  (*Id.*)

Plaintiff currently smokes two packs of cigarettes per day.  (Tr. 53.)  Due to her COPD, she cannot walk far without getting winded.  (*Id.*)  She gets winded after walking to her mailbox, which involves walking for about 150 feet, as well as when she tries to clean, such as vacuuming her house.  (*Id.*)  She has a hard time breathing.  (*Id.*)  She has shortness of breath when she takes the stairs.  (Tr. 53-54.)  The last time plaintiff tried to quit smoking was in June 2018.  (Tr. 54.)  In March 2019, she started smoking again to deal with stress and anxiety.  (Tr. 54, 56-57.)  In the period when she did not smoke, she experienced less shortness of breath.  (Tr. 54.)  She uses two inhalers for COPD.  (*Id.*)

Fibromyalgia affects plaintiff's entire body.  (Tr. 55.)  Her worst areas are arms, legs, and shoulders.  (*Id.*)  She has pain in those areas all day long on a daily basis.  (Tr. 54-55.)  She is using a continuous positive airway pressure machine for sleep apnea.  (Tr. 56.)  She still has daytime sleepiness about five or six days a week.  (*Id.*)  She is taking medication for bipolar disorder, which helps.  (Tr. 56-57.)  She is not taking a particular medication for anxiety.  (Tr. 56.)

A vocational expert (VE) testified to the following.  A hypothetical individual at the light exertional level with plaintiff's age, education, work experience, and limitations that would become plaintiff's residual functional capacity (RFC) could not perform her past work as a heavy equipment operator.  (Tr. 58-59.)  That individual could perform other work in the national economy such as housekeeper, price marker, or cafeteria attendant.  (Tr. 59.)  If the same hypothetical individual could have only occasional contact with people, the individual would not be able to work as a cafeteria attendant, but would still be able to work as a housekeeper or price marker.  (Tr. 60.)  If the same hypothetical individual as the first could

work only at a sedentary level, the individual could perform work in the national economy such as addresser, document specialist, or nut sorter.  (*Id.*)  There would not be any competitive work available if the hypothetical individual is off task ten percent of the time or is absent more than one day a month.  (Tr. 60-61.)  Generally, an employer does not tolerate absences during the training or probationary period.  (Tr. 61.)

## III.  DECISION OF THE ALJ

On May 26, 2020, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 29.)  At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since November 29, 2018, the alleged onset date.  (Tr. 17.)  At Step Two, the ALJ found that plaintiff had the severe impairments of diabetes mellitus with polyneuropathy,[14] obesity, and bipolar disorder.  (*Id.*)  At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20.)

At Step Four, the ALJ determined that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following limitations:

> [S]he can occasionally climb ramps and stairs but no ladders, ropes, or scaffolds; frequently balance (as defined by the DOT); frequently stoop, kneel, crouch, and crawl; no unprotected heights.  She is limited to routine, repetitive tasks, but has sufficient concentration to persist in the performance of such tasks at a reasonable rate with standard breaks, with few changes in work setting, only simple work related judgments, and frequent interactions with supervisors, coworkers and the general public.

(Tr. 22.)  The ALJ concluded that plaintiff could not return to her past relevant work.  (Tr. 27.) At Step Five, with the VE testimony, the ALJ concluded that considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could perform.  (Tr. 28.)  Accordingly, the ALJ concluded that plaintiff has not been disabled under the Social Security Act.  (Tr. 29.)

---

[14] Polyneuropathy is a disorder of the peripheral nerves that run throughout a person's body.  https://www.healthline.com/health/polyneuropathy.

## IV.  GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision.  *Id*.  As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently.  *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant has the RFC to perform her past relevant work (PRW).  *Id.* § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  *Pate-Fires*, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other

work that exists in significant numbers in the national economy.  *Id*.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff asserts the ALJ erred in (1) failing to find her COPD is a severe impairment; (2) failing to properly evaluate her RFC; and (3) failing to properly consider 20 C.F.R. § 404.1527 by not giving adequate weight to her treating physicians' opinions.  (Doc. 14 at 3.)

**Severity of Plaintiff's COPD Impairment**

Plaintiff argues that the ALJ did not sufficiently consider the severity of her COPD or the restrictions imposed by her COPD.  (*Id.* at 4-5.)  The record shows that the ALJ thoroughly considered plaintiff's COPD.  (Tr. 18.)  The ALJ explained in detail that she did not find plaintiff's COPD to be severe because the record did not suggest that COPD more than minimally impacts plaintiff's ability to work.  (*Id.*)  She noted that plaintiff received ongoing treatment for her COPD, consistently reported shortness of breath with exertion, and used her Albuterol inhaler daily.  (*Id.*)  The ALJ pointed out that plaintiff's most recent pulmonary function testing in the record from 2017 showed no obvious obstructive ventilatory defect or restriction, and no significant desaturation at rest or with activity, with 96% saturation.  (Tr. 18, 416.)

The ALJ noted that plaintiff's examinations generally showed normal oxygen saturation, and pulmonary examinations frequently showed that her lungs were clear to auscultation with no wheezing or rales and normal breath sounds or respiratory effort.  (Tr. 18, 400, 407, 414, 420, 691, 696, 702, 734, 738, 740, 764, 774, 785, 795, 806, 818, 824.)  She mentioned that plaintiff's chest x-rays in August 2018 and September 2019 were relatively normal, and the record did not suggest that plaintiff had any hospitalization for COPD exacerbations.  (Tr. 18, 521, 821.)  The ALJ pointed out that although plaintiff alleged shortness of breath with exertion, she could ambulate independently with an assistive device and was independent in her daily activities.  (Tr. 18, 46, 54.)

Plaintiff contends that the ALJ did not consider the opinion of the state agency's own doctor, Judee Bland, M.D., that plaintiff's COPD was a severe impartment.  (Tr. 104-113.)  The ALJ is not required to defer or give any specific evidentiary weight to any medical

- 13 -

opinions.  20 C.F.R. § 404.1520c(a).  Instead, the ALJ must consider the consistency and supportability of the medical opinions.  *Id.*  Here, the ALJ found that plaintiff's examinations have yielded largely normal findings, and she has not presented more persistent or significant abnormalities that would support a finding that her COPD is a severe impartment.  (Tr. 18.)  The ALJ's findings regarding the severity of plaintiff's COPD are supported by substantial evidence.

Even if the ALJ erred in failing to find that plaintiff's COPD is a severe impairment, it was a harmless error.  *See Givans v. Astrue*, No. 4:10CV417 CDP, 2012 WL 1060123 at *17 (E.D. Mo. Mar. 29, 2012); *Amis v. Astrue*, No. 4:09CV1376 CAS, 2010 WL 3040265 at *13 (E.D. Mo. July 14, 2010).  Because the ALJ found that plaintiff has other severe impairments, she proceeded to Step Five of the analysis to determine plaintiff's RFC.  (Tr. 17-29.)  When determining plaintiff's RFC, the ALJ was required to consider any non-severe impairments.  20 C.F.R. § 404.1545(a)(2).  A review of the ALJ's decision shows that she considered plaintiff's symptoms and complaints related to COPD in her analysis subsequent to Step Two.  (Tr. 17-29.)  Because the ALJ properly considered the impairment of COPD in her subsequent analysis, the determination at Step Two that plaintiff's COPD is not severe was harmless.  *See Givans*, 2012 WL 1060123 at *17; *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

**Residual Function Capacity**

Plaintiff argues that she should be limited to sedentary work instead of light work because of her neuropathy, obesity, and COPD.  (Doc. 14 at 5-6.)  Plaintiff also contends that the state agency's RFC evaluation, which was adopted by the ALJ, did not consider her diabetes with polyneuropathy.  (*Id.*)  Part of the RFC determination includes an assessment of plaintiff's credibility regarding subjective complaints. Using the *Polaski* factors, "[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (noting *Polaski* factors must be considered before discounting subjective complaints). The *Polaski* factors include (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Polaski*, 739 F.2d

at 1322; *see also* 20 C.F.R. § 404.1529.  "A failure to follow a recommended course of treatment also weighs against a claimant's credibility."  *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

Here, the ALJ considered the *Polaski* factors. The adjudicator is "not required to discuss each *Polaski* factor as long as '[she] acknowledges and considers the factors before discounting a claimant's subjective complaints.'"  *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).  The ALJ noted that plaintiff was independent in her self-care and performed household chores.  (Tr. 24, 260.)  The various activities that plaintiff is capable of support the ALJ's findings that plaintiff could perform a range of light work with limitations.

The ALJ considered the objective medical evidence and noted that plaintiff's allegations of the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. 23.)  The ALJ noted that although plaintiff reported compliance with her medication regime for diabetes mellitus, she did not strictly comply with recommendations on diet and exercise.  (Tr. 23, 583, 586, 731.)  Despite limited control over plaintiff's blood sugars, the record did not show any hospitalizations due to her diabetes.  (Tr. 23.)  Regarding plaintiff's neuropathy, the ALJ noted that plaintiff's motor strength, gait, and coordination were normal, and there was no evidence of ulceration or of plaintiff being unable to ambulate independently.  (Tr. 23, 734.)  The ALJ considered the impact of plaintiff's obesity on her RFC in combination with her diabetes and polyneuropathy, including limiting her to light exertion, assessing postural limitations, and limiting exposure to hazards.  (Tr. 24.)  Regarding plaintiff's COPD, the ALJ found that the state agency's opinion on the environmental restrictions related to COPD was unpersuasive because that the objective medical evidence did not support a severe pulmonary impairment. (Tr. 23-24.)  As discussed earlier, the ALJ thoroughly explained her findings about the impact of plaintiff's COPD.

Here, the ALJ determined that plaintiff had the RFC to perform light work with various limitations.  (Tr. 22.)  She cited plaintiff's clinical findings and activities of daily living as described above.  (Tr. 22-27.)  The ALJ's findings are supported by substantial evidence.

- 15 -

**Physician Opinions**

Plaintiff argues that the ALJ erred in finding that the opinions of Dr. Marks and Dr. Simons, her treating mental health providers, were not persuasive.  (Doc. 14 at 6.)  She noted that both Dr. Marks and Simons opined that she would be absent from work at least one day every month.  (Doc. 14 at 6; Tr. 831-38.)

In assessing a medical opinion, an ALJ may consider factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability with relevant medical evidence, consistency between the medical opinion and the record as a whole, the physician's specialization, and any other relevant factors brought to the attention of the ALJ.  *See* 20 C.F.R. § 404.1527(c)(1)-(6); *Owns v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (holding that when a treating physician's opinion is not entitled to controlling weight, the ALJ must consider several factors to determine the amount of weight given to the opinion).  Although an ALJ is not required to discuss all the relevant factors when determining what weight to give a physician's opinion, the ALJ must explain the weight given the medical opinion and give good reasons for doing so.  *See* 20 C.F.R. § 404.1527(c)(2).  "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence.'"  *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).

The ALJ considered Dr. Simon's opinion but noted that he did not provide an explanation for his opinion that plaintiff would be absent from work about one day per month because of her mental health symptoms.  (Tr. 26, 837-38.)  The ALJ explained that Dr. Simon's opinion on the number of absences plaintiff would have was inconsistent with his own treatment records, including mental status examinations showing relatively normal mental functioning, generally intact attention or concentration, and logical and linear thoughts.  (Tr. 26-27, 328, 333, 620, 633, 638, 651.)

Similarly, the ALJ noted that Dr. Marks did not explain why he opined that plaintiff would miss work two days a week.  (Tr. 26.)  She considered the fact that Dr. Marks provided no response as to the degree of limitation that plaintiff would have in understanding, remembering, or applying information; interacting with others; concentration, persistence, or

maintaining pace; and adapting or managing herself.  (Tr. 26, 833.)  The ALJ mentioned that Dr. Marks' opinion was inconsistent with his treatment records, which showed that plaintiff made progress in therapy and with Dr. Simon's examinations.  (Tr. 26, 327-81, 609-59.) Accordingly, the ALJ properly discounted the relevant portions of Dr. Simon's and Dr. Marks' statements.

The ALJ concluded, based on substantial evidence, that plaintiff was not disabled and that she had the RFC to perform light work.

### CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

_____**/s/ David D. Noce**_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 2, 2022.

- 17 -